Filed 7/21/15  Marriage of Marino CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re Marriage of MOLLY and JAMES E. MARINO. | 2d Civil No. B253677<br>(Super. Ct. No. 1384748)<br>(Santa Barbara County) |
| MOLLY MARINO,<br><br>    Respondent,<br><br>v.<br><br>JAMES E. MARINO,<br><br>    Appellant. | |

James E. Marino (Jim) appeals the trial court's judgment that he was not entitled to reimbursement under Family Code section 2640[1] for his separate property contribution to the home he shared with his former wife, Molly Marino (Molly).[2]  We conclude substantial evidence supports the court's finding that he failed to prove the amount of that contribution.  We affirm.

FACTS AND PROCEDURAL HISTORY

In 1982, Jim purchased a 30-year-old, 2,400-square-foot, one-story tract home in Santa Barbara.  He financed the purchase with a $25,000 bank loan and a

---

[1] All statutory references are to the Family Code.
[2] To avoid confusion, we refer to the parties by their first names.

$136,590 loan from the sellers. There is no record of the purchase price or downpayment. In late 1985, he obtained another bank loan for $65,000 and the deed of trust on the $136,590 loan was reconveyed. The deed of trust on the $25,000 loan was reconveyed in January 1986. Molly moved into the home in 1986 and the parties married in 1988.

Jim was a self-employed attorney and Molly worked for the City of Santa Barbara. After she moved into the house, she began making the monthly mortgage payments from her separate property funds. Following the marriage, the parties maintained their own checking accounts. Molly typically paid the mortgage, property taxes, hazard insurance premiums, utilities and repair expenses from community funds in her account. Occasionally Jim would give her community funds from his law practice checking account.

A fire completely destroyed the home in 1990. Jim and Molly replaced it with a custom four-bedroom, four-bath home that was twice the size of their former home. They also added a pool. The $400,000 reconstruction was financed partly by insurance proceeds and partly by community funds. The insurance company also paid off the existing $65,000 deed of trust, leaving the property unencumbered.

Title was vested in Jim as his separate property until 1997, when the parties decided they needed "to take some money out of the house." They borrowed $209,000 and used approximately $161,000 to pay several debts, including two premarital judgments against Jim totaling $56,000 plus $71,000 in tax arrearages that were partially a community obligation and partially Jim's premarital debt. During this period, Jim was suspended from practicing law.

Molly signed the promissory note for the 1997 loan and Jim executed an interspousal grant deed transferring title to them both as community property. The value of the reconstructed house at that time was $925,000. In subsequent years, the parties refinanced the loan a number of times to pay community obligations as well as Jim's premarital debts. They increased the loan principal to $295,000 in 2002, to $330,000 in 2004, and to $395,000 in 2008. On each occasion, Molly signed the promissory note and

continued making the mortgage, tax, insurance and utility payments from her account with little assistance from Jim, who began phasing out his law practice.

During the 2004 refinance, Jim told Molly that because her credit rating was not as good as his, she would have to go off title "[v]ery temporarily" to allow them to obtain a better interest rate. He promised to restore her to title after the refinance. When the parties discussed another possible refinance in 2010, Molly discovered that Jim had not restored her to title. Once again, he promised to add her, but then failed to do so.

The parties separated in 2011. To obtain a lower interest rate, Jim suggested another refinance. Molly agreed, provided she was returned to title. Jim consequently added her to title as a joint tenant and they completed the refinance.

During trial, Jim claimed a separate property interest in the residence. At that time, it was worth $1,475,000 and the loan balance was $371,166. The trial court's initial statement of decision found that title was conclusively established by the 1997 grant deed. It stated that "[l]ogic, the parties' conduct, their past financial history, and their various representations in testimony at trial, in light of the applicable law (including a strong legal presumption), all point to a deliberate change in title to the community in 1997, with no intentional return of title to [Jim] thereafter." The court further found that Jim had failed to prove a right to a separate property reimbursement under section 2640. It determined Jim "did not produce information adequate to trace, not even a starting point – there is no evidence of his equity at the time of purchase, and even if that information was available, [he] produced no adequate evidence to trace a separate interest through the various refinances." The court ordered that the property be sold and the proceeds divided equally.

After Jim objected to the statement of decision, the trial court issued a final statement incorporating its earlier findings and clarifying the basis for its determination that he lacked a separate property interest. It explained: "[T]he deeding of the property in 1997 was a reflection of what the parties knew to be the reality – that [Jim] retained no separate property interest at the time the property was deeded to the community. [He]

3

presented insufficient information at trial to support a different conclusion." Jim appeals this decision.[3]

## DISCUSSION

Except under circumstances that are inapplicable here, "property acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property." (§ 2581; see *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1406.) Jim's opening brief does not challenge the trial court's finding that he transmuted the house to community property by deeding it to the community in 1997.[4] Rather, he asserts the court erred by denying his request for a separate property reimbursement under section 2640. He claims he is entitled to the value of the residence at the time it was transferred to the community. Molly maintains that Jim failed to carry his burden of proof due to his poor recordkeeping and his less-than-credible trial testimony. We agree with Molly.

Section 2640, subdivision (b) provides that "unless a party has made a written waiver of the right to reimbursement . . . , the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source." The recoverable reimbursement "is the value of the separate property contributions at the time they were made." (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057.) "Commingling of separate and community property does not alter the status of the separate property interest so long as it can be traced to its separate property source."

---

[3] The trial court also denied Molly's request for credits for the period Jim had sole post-separation use of the residence (see *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 372-374), and made additional rulings regarding the parties' other assets and liabilities, their requests for attorney fees and Jim's request for spousal support. These issues are not raised on appeal.

[4] After the opening brief was filed, Jim's attorney substituted out of the case and Jim elected to represent himself. His reply brief raised the transmutation issue for the first time on appeal. For reasons of fairness, "[a]rguments presented for the first time in an appellant's reply brief are considered waived." (*Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1292, fn. 6.) Accordingly, we do not address this or any other issues raised for the first time in the reply.

4

(*Ibid.*) "Whether the spouse claiming a separate property interest has adequately met his or her burden of tracing to a separate property source is a question of fact and the trial court's holding on the matter must be upheld if supported by substantial evidence." (*Id.* at pp. 1057-1058; see *In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 822-823.)

Section 2640 requires that the separate property contribution be reimbursed before division of the community property interest. (*In re Marriage of Witt* (1987) 197 Cal.App.3d 103, 105, 108-109.) When Jim transmuted the residence to community property in 1997, it was worth $925,000 and had no encumbrances. Jim contends this evidence more than satisfies the "light" tracing burden imposed on him by section 2640. (See *In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 842.) As Molly points out, it is not that simple. The relevant number is not the property's value, but rather Jim's equity in the property. "Once the trial court in a dissolution proceeding determines that the contributing spouse did give the property to the community . . . and that the contributing spouse did not execute a . . . waiver, then the court is required to determine the equity value of the contributing spouse's property at the time of the gift . . . ." (*Witt,* at pp. 108-109.) This generally consists of the fair market value of the residence at the time of the transmutation, less outstanding encumbrances and any nongift community property contributions to principal before the conversion. (*In re Marriage of Walrath* (1998) 17 Cal.4th 907, 920-921, fn. 5; *Witt,* at pp. 105, 108-109.)

*In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278 (*Geraci*) is instructive. The husband challenged the trial court's denial of his request for reimbursement of his separate property interest in a home he purchased years before the parties' marriage. (*Id.* at p. 1282.) The husband had razed the structure and replaced it with an entirely new residence. After the marriage, the parties refinanced the house and took out home equity loans on six separate occasions. (*Id.* at p. 1287.) Although the house was his separate property before the marriage, the husband failed to introduce evidence of how the rebuilding project was financed or of the amount of his equity at the time of the marriage. The court noted there was significant evidence of the various refinances, but "an absence of evidence concerning the crucial issue of [his] actual

5

contributions of separate property to acquire and improve the residence . . . , and thus by extension, an absence of evidence of his actual equity interest in the property at the time of marriage." (*Id.* at p. 1288, fn. omitted.) The court specifically rejected evidence of the value of the property at the time of the marriage as "largely immaterial." (*Id.* at p. 1288.) Without evidence of his actual equity in the house, the husband failed to carry his burden of adequately tracing his separate property contributions to the asset. (*Ibid.*)

Here, the trial court similarly concluded that "[i]t is unknown what percentage of the value of the home at time of purchase constituted the separate property interest. The community began paying all expenses soon after the purchase. The figures that are known about the purchase transaction suggest that the interest of [Jim] was not large. The value at the time of deed to the community is not of significance to the court's analysis, because any tracing would be from the time the community began to invest in the separate asset. [Jim] bears the burden to trace this interest and he has not done so adequately." Substantial evidence supports these findings.

Jim did not acquire the large, relatively new, upgraded residence that he transferred to the community in 1997. The record reflects that he acquired a modest, 30-year-old home by obtaining two loans totaling $161,590. Before Molly moved in, both loans were reconveyed and Jim had a new loan for $65,000. But Jim produced no evidence of the purchase price, downpayment or source of payment of the two original loans. Moreover, his claim of entitlement to the fair market value of the house at the time of the transfer fails to take into consideration (1) Molly's contributions to the principal from her separate property before the marriage, (2) the community's subsequent payment of the mortgage, property tax obligations, insurance, utilities and home maintenance charges, (3) the community's refinancing of the property to repay, in part, Jim's significant separate property debts, and (4) the community's use of $400,000 in community funds and insurance proceeds to build the more luxurious, larger home. We disagree with Jim's assertion that the insurance proceeds took on the character of the residence and became his separate property. Because the community paid the insurance

6

premiums, the proceeds were community property. (*Blethen v. Pacific Mut. Life Ins. Co.* (1926) 198 Cal. 91, 99; see *In re Marriage of O'Connell* (1992) 8 Cal.App.4th 565, 577 ["Both spouses ordinarily have a community interest in the proceeds of an insurance policy to the extent it was acquired with community funds"].) Thus, the use of the insurance proceeds and other community funds to rebuild and maintain the residence gave the community a pro tanto interest in the property. (See *In re Marriage of Moore* (1980) 28 Cal.3d 366, 371-372; *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 436-440; *Geraci, supra,* 144 Cal.App.4th at p. 1287.)

Based on this evidence, the trial court was unable to differentiate between the community's pro tanto interest and Jim's equity interest at the time of the transfer because he only introduced evidence of the property's fair market value. He did not account for the community's enhancement of the property's value, its payment of the existing mortgage or its refinance of the property to repay his significant premarital debt. As the trial court found, it may be that once these deductions are made from the $925,000 value, his equity interest is de minimis or nonexistent. The court was not required to speculate as to the equity value after taking these factors into account. It was Jim's burden to trace the amount of that equity and he failed to meet that burden. (§ 2640; *In re Marriage of Marsden, supra,* 130 Cal.App.3d at p. 441; *Geraci, supra,* 144 Cal.App.4th at p. 1288.)

We reject Jim's contention that he should be excused from producing documentary evidence tracing his separate property interest because the records were destroyed or otherwise could not be located. "A party who commingles his or her separate property with property of the community assumes the burden of keeping adequate records." (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 330.) In the absence of such records or of credible testimony establishing Jim's equity interest, the trial court properly denied his section 2640 claim for reimbursement. The evidence

7

supports the court's finding that the community's investment in the residence subsumed his initial separate property interest.

DISPOSITION

The judgment is affirmed.  Respondent shall recover her costs on appeal.

<u>NOT TO BE PUBLISHED.</u>


PERREN, J.

We concur:


GILBERT, P. J.


YEGAN, J.

Colleen K. Sterne, Judge

Superior Court County of Santa Barbara

_____

Law Office of Herb Fox, Herb Fox; James E. Marino, in pro. per., for Appellant.

Law Offices of Charles M. Oxton, Charles M. Oxton; Ferguson Case Orr Paterson LLP, Wendy C. Lascher, John A. Hribar, for Respondent.